IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CHERTOFF CAPITAL, LLC     PLAINTIFF

v.     Case No. 1:21-cv-00591

JASON SYVERSEN and RAMPART HOLDINGS, LLC     DEFENDANTS

**MEMORANDUM OPINION**

    Before the Court is the motion for summary judgment filed by Defendants Jason Syversen and Rampart Holdings, LLC (ECF No. 77). This matter has been briefed and is ready for consideration. (ECF Nos. 78, 80, 84).[1]

## I. Background

### A. Procedural Background

    On May 23, 2019, Plaintiff Chertoff Capital, LLC filed suit against Braes Capital, LLC and Jason Syversen in the Eastern District of Virginia (the "Prior Case"). *See Chertoff Capital, LLC v. Braes Capital, LLC et al.*, Civil Action No. 19-cv-631 (E.D. Va.). The complaint in the Prior Case alleged claims of tortious interference with a contract against Braes Capital, tortious interference with a business expectancy against Braes Capital, common law business conspiracy against Braes Capital and Syversen, statutory business conspiracy against Braes Capital and Syversen, and anticipatory breach of contract against Syversen. On June 11, 2019, Syversen filed a motion to dismiss the complaint in the Prior Case for lack of jurisdiction. On June 14, 2019, Braes Capital filed a motion to dismiss the complaint in the Prior Case for lack of jurisdiction and for failure to state a claim. On July 2, 2019, Plaintiff filed an amended complaint in the Prior Case pursuant to Fed. R. Civ. P. 15(a)(1). On July 26, 2019, Braes Capital and Syversen each filed a motion to dismiss the amended complaint in the Prior Case. On August 26, 2019, Braes Capital and Syversen's motions to dismiss were referred to the Magistrate Judge for a Report and Recommendation

---

[1] The Court finds that additional oral argument is unnecessary. (ECF No. 86).

pursuant to 28 U.S.C. § 636(b)(1)(B). On October 31, 2019, the Magistrate Judge issued a Report & Recommendation (the "Report"). The Report recommended that all of Plaintiff's claims in the amended complaint in the Prior Case be dismissed with prejudice. On November 14, 2019, Plaintiff filed objections to the Report and a motion for leave to file a second amended complaint. On November 22, 2019, prior to any ruling on the Report, Plaintiff's objections to the Report, or Plaintiff's motion for leave to file a second amended complaint, Plaintiff filed a notice of voluntary dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). The Prior Case was ordered dismissed without prejudice that same day.

On February 7, 2020, Plaintiff filed a new complaint against Braes Capital and Defendants Jason Syversen and Rampart Holdings, LLC, in the United States District Court for the Eastern District of Virginia. (ECF No. 1). Count one of the complaint was against the Defendants for breach of contract, and count two was against Braes Capital for intentional interference with a contract. *Id.* On April 17, 2020, Defendants filed an answer. (ECF No. 16). On May 28, 2020, the Court directed the parties to show cause why this case should not be transferred to the District of Delaware based on the disputed contract's forum selection clause. (ECF No. 28). On April 27, 2021, the Court severed count one from count two and transferred count one to the District of Delaware. (ECF No. 52). On October 26, 2021, the parties stipulated to a nonjury trial. (ECF No. 76).

B. **Factual Background**

Defendant Syversen founded Siege Technologies, LLC in 2009 and served as its chief executive officer. (ECF No. 78-1 ¶ 1). In 2016, Siege was acquired by Nehemiah Security, LLC. *Id.* At some point in 2018, Nehemiah's chief executive officer, Paul Farrell, asked Syversen if he was interested in buying Siege back from Nehemiah. (*Id.* ¶ 2). At that time, it appeared that Siege could be repurchased for less than Nehemiah had paid for it two years prior. *Id.* Consequently, he became interested in trying to organize a management buy-out of Siege, repurchasing the company in concert with the other key management personnel. *Id.* To effectuate that management buyout, Syversen needed a source of funds because the three key management personnel of Siege—Samuel Corbitt, Joseph Sharkey and Syversen—did not have sufficient capital to purchase Siege. (*Id.* ¶ 3).

Syversen retained Plaintiff to assist with the management buyout acquisition and to find interested investors. *Id.* He signed a contract with Plaintiff on November 15, 2018 (the "Contract"), which set forth the terms of their agreement. (ECF No. 78-2).

First, the Contract stated that Plaintiff was being retained to provide advice concerning Syversen's potential acquisition of Siege via a management buyout acquisition:

> We are pleased to confirm the arrangements under which Chertoff Capital, LLC ("Chertoff" or "Advisor") is engaged by you ("Client") to provide banking advisory services . . . regarding your potential management buyout (MBO) acquisition of Siege Technologies, LLC ("Target") from Nehemiah Security, LLC ("Seller").
>
> * * *
>
> Chertoff will serve as the Client's exclusive investment banking advisor and support the Client's potential MBO of the Target (the "Transaction").

*Id.*

The Contract became effective on November 15, 2018 and was to continue until (1) "the Client decides not to move forward with the acquisition of the Target"; (2) "the Closing" occurs; or (3) "it is mutually agreed upon to extend or terminate [the Contract] in writing." (*Id.* at 3). There were no additional restrictions or limitations put on Syversen's option to quit pursuing his management buyout acquisition.

The Contract stated that Plaintiff would be paid "4% of the Total Consideration paid for the Target," subject to a minimum payment of $600,000, but only "[u]pon the successful closing of the acquisition of Target." *Id.* Syversen, as the Client, also agreed to reimburse Plaintiff's "travel expenses" and "other reasonable and documented out-of-pocket fees and expenses," subject to a cap of $5,000. *Id.*

The Contract addressed how to calculate the "Total Consideration" paid for Siege, depending on whether the management buyout acquisition resulted in the acquisition of all of Siege or the acquisition of only a majority of the company:

> The term "Total Consideration" shall mean the total amount of cash and the fair market value of other property paid or payable (including amounts paid into escrow) to the Seller in connection with the Transaction.
>
> If a Transaction, other than a sale of assets, results in a majority (but less than all) of the stock of the Company having been acquired, the Total Consideration shall be calculated pursuant to this paragraph as an acquisition of stock in which all of the stock of the

3

>Company had been acquired at a price equal to the highest price per share paid by the Purchaser for any shares it acquired at the time of the Transaction.

*Id.* The Contract did not address how to calculate Total Consideration if only a minority stake in Siege was acquired by Syversen.

The Contract was amended in early December. (ECF No. 78-1 ¶ 3). Plaintiff drafted the amendment. *Id.* According to the Contract, signed on November 25, 2018, Syversen was the "Client." *Id.* After signing the Contract, he created Rampart to be the entity to purchase Siege. *Id.* Syversen was the only member of Rampart, which also never had any employees, officers or managers. *Id.* Plaintiff wanted Rampart to be a party to the Contract, so on December 7, 2018, the agreement was amended in writing (the "Amendment"). (ECF No. 78-3). The substantive terms of the Contract were unaltered, but both Rampart and Syversen collectively became the "Client." *Id.* Thus, as of December 7, Plaintiff was providing services and advice concerning Syversen's and Rampart's potential management buyout acquisition of Siege.

In late January 2019, Rampart and Nehemiah signed an agreement in which Nehemiah agreed to negotiate only with Rampart concerning the sale of Siege through March 20, 2019. (ECF No. 78-4). The period of exclusivity was later extended through April 15, 2019. *Id.* On behalf of Rampart, Syversen searched for possible investors to finance the management buyout and located two: Braes Capital, located in Houston and headed by Alex Clary; and Three Kings Capital, located in New York City and headed by Bill Ryckman. (ECF No. 78-1 ¶ 3). Both companies submitted term sheets and, consistent with Syversen's goal of a management buyout acquisition, both term sheets provided Siege management with a majority of the resulting board member positions. (*Id.* ¶ 4). After weighing the options and consulting with Plaintiff, Syversen decided that Three Kings Capital was a better choice and began negotiations with it. *Id.*

As far as Syversen was concerned, the management buyout acquisition had to include the continuation of Samuel Corbitt, Siege's president and co-founder, and Joseph Sharkey, its chief technical officer, in Siege's management. (*Id.* ¶¶ 3, 5). Unless they both agreed to continue to work full time at Siege, Syversen did not want to pursue the management buyout acquisition. (*Id.* ¶ 5). During the

4

negotiations, it became apparent that Sharkey was reluctant to continue with the company after a management buyout. *Id.*  He made a series of demands which needed to be resolved for him to remain with Siege, but they were demands which Syversen could not accept. *Id.*  Syversen also understood that Three Kings Capital did not want to proceed with financing the management buyout acquisition unless Sharkey continued with Siege. *Id.*

On April 3, 2019, negotiations with Sharkey reached an impasse and Syversen decided not to pursue the management buyout acquisition of Siege any longer. *Id.*  He told Plaintiff that the management buyout was "not tenable" and that "we need to halt pursuit of the Rampart MBO." (ECF No. 78-6). Moments later, Syversen instructed Steven Kaplan, Rampart's attorney at Pillsbury Winthrop Shaw Pittman, to cease all work and send a bill for all work done because "the MBO is dead." (ECF No. 78-7). He copied Plaintiff on that email. *Id.*

On that same day, Rampart and Syversen formally withdrew from the negotiations with Nehemiah and released it from any exclusivity obligation. (ECF No. 78-8).  Syversen resigned from Siege on April 19, 2019. (ECF No. 78-1 ¶ 5). He told Ryan Hoffman of Plaintiff again, ten days later, that he was "not going to be pursuing the management buyout." *Id.*  In a letter to Plaintiff dated May 20, 2019, Syversen confirmed, one more time, that "the MBO is dead" and had been since April. (ECF No. 78-9).

Negotiations for the acquisition of Siege by Braes Capital occurred after Syversen announced that his management buyout was not going to work. (ECF No. 78-1 ¶ 6). In May 2019, he flew to Houston at Braes Capital's request to speak with potential investors it had identified who might be willing to provide financing for its acquisition of Siege.  *Id.*  Even though he had abandoned his management buyout acquisition, Syversen was still willing to assist Braes Capital's efforts to acquire Siege; he hoped that Siege, the company he founded, and which employed people whom he knew, would continue to be successful if acquired by Braes Capital. *Id.*  Other than reimbursement of his expenses for that trip, Syversen was not paid by Braes Capital to go to Houston. *Id.*

In July 2019, Braes Capital acquired Siege through an entity it had formed called Braes Sneakers, LP ("Braes Sneakers"). (*Id.* ¶ 7). The purchase price was approximately $15,540,000. (ECF No. 78-10 ¶

5

3). Neither Syversen nor Rampart had any role in the negotiations of that transaction between Braes Capital and Nehemiah or in the creation of the structure for that transaction. (ECF No. 78-1 ¶ 7). Syversen invested $250,000 in Braes Sneakers and became a limited partner. *Id.* This investment represents only approximately 1.5% of the "Total Consideration" paid for Siege.

As a limited partner of Braes Sneakers, Syversen has no voting rights and does not participate in its management. *Id.* He is solely a passive investor. *Id.* Syversen is not a member, manager, officer, director, full or part time employee, consultant or contractor of Siege or Braes Sneakers. *Id.* He did negotiate with Braes Capital about becoming a part time officer/consultant of Siege, but never came to agreement on the terms of his retention. *Id.* Rampart did not invest in Braes Sneakers, nor did it become a member or manager of Siege. Instead, it was administratively dissolved by the State of New Hampshire on August 31, 2021. *Id.*

Siege is now run by a board of managers—which does not include Syversen—that has "complete authority to manage the business and affairs of" Siege. (ECF No. 78-12 § 6.1). Braes Sneakers owns 100% of Siege. (ECF No. 78-10 ¶ 3). It has one general partner, Braes Capital. (*Id.* ¶ 4). According to its limited partnership agreement, Braes Sneakers is managed exclusively by the General Partner. (ECF No. 78-11 § 4.1). "No Limited Partner shall take part, or have the right or power to take part, in the control of the business of" Braes Sneakers. *Id.* "The Limited Partners . . . shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law." (*Id.* § 4.9). The Braes Sneakers' partnership agreement does not otherwise provide for any votes on anything by limited partners. *Id.* As a result of these provisions, neither any current officer of Siege, nor Syversen, has any power to direct or control the company's business.

**II.     Standard of Review**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). An assertion

that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

**III.   Discussion**

The Contract and the Amendment are governed by Delaware law.[2] To state a claim for breach of contract, a plaintiff must establish that a contract existed; the defendant breached an obligation imposed by the contract; and that the defendant's breach damaged the plaintiff. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The parties do not dispute that a contract existed.

---

[2] Section 3 of the Contract's Standard Terms and Conditions states in part that "The Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (DE) without reference to principles of conflicts of law." (ECF No. 78-2).

7

The central dispute at hand is whether the subsequent acquisition of Siege by Braes Capital constituted an MBO under the terms of the Contract.

When the contract is clear and unambiguous, the Court will give effect to the plain meaning of the contract's terms and provisions. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010). However, if it is possible to reasonably ascribe multiple and different interpretations to a contract, the Court will find that the contract is ambiguous. *Id.* at 1160. "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* If a contract is ambiguous, the doctrine of *contra proferentem* applies against the drafting party, and the contract is interpreted in favor of the non-drafting party. *Id.* "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." *Id.*

First, Braes Capital was never a party to the contract between Plaintiff and Defendants. Plaintiff asks the Court to construe the acquisition of Siege by Braes Capital as an acquisition by Defendants. Notably, the Contract between Plaintiff and Defendants was rescinded prior to Braes Capital's purchase of Siege. On this alone, the Court finds that Braes Capital's acquisition of Siege was not subject to the Contract. Further, Braes Capital independently obtained the funding for its purchase of Siege. Later, Defendant Syversen became a limited partner of Braes Capital, but his money did not go directly towards the acquisition of Siege. Considering the $15,540,000 purchase price and Syversen's contributions of $250,000 and $500,000, through his charitable organization S8 Impact Foundation, it is possible that Braes Capital could have acquired Siege without the additional funding. Regardless, Defendants never received ownership of Siege under the terms of the Contract.[3] (ECF No. 78-1 ¶ 7).

Second, even if the Court were to construe the contract as binding on Braes Capital, the acquisition of Siege would not have constituted an MBO under the Contract. As mentioned repeatedly, the term

---

[3] As stated in Defendants' brief, "Documents received by the defendants in discovery show that Mr. Sharkey invested $25,000 in Braes Sneakers and that Mr. Corbitt invested $300,000 in Braes Sneakers, both becoming limited partners. Their collective investment amounts to approximately 2.0% of the Total Consideration paid for Siege." (ECF No. 78 at 11 n. 6). However, their status is similar to that of Syversen's.

"MBO" is not defined by the contract.  However, it is clear that Plaintiff intended to assist Defendants in raising the funds to obtain control over Siege.  Other than Defendant Syversen's potential, future role with Braes Capital, it is clear that the managers of Siege did not obtain control over the company after the purchase by Braes Capital.  In addition, the Contract clearly indicated that the managers would receive majority ownership of Siege.  Even construing Defendant Syversen's limited partnership with Braes Capital as ownership of Siege, the result would be that he has a minority ownership interest.

The term "MBO" could be considered ambiguous because of the fact that it does not seem to contemplate any subsequent purchase of Siege that Defendants could have been a party to.[4]  However, Plaintiff drafted the Contract.  Therefore, ambiguity is to be construed in favor of the non-drafting party, the Defendants.  It would not make sense to extend the Contract—that specifically indicates that Plaintiff was retained to help Defendants in an MBO—to any possible transaction Defendants may engage in involving Siege.

Finally, Plaintiff asks the Court to consider anticipatory repudiation as the basis for its breach of contract claim.  Even if the Court were to consider Plaintiff's argument, its claim for breach of contract still fails.  Notably, this argument was rejected in the Magistrate's Report and Recommendation issued before Plaintiff's voluntary dismissal of the Prior Case.  While the Report is not controlling, it is highly persuasive.  Section 5 of the agreement between Plaintiff and Syversen states that the contract remains in effect until "the Client decides not to move forward with the acquisition of the Target."  (ECF No. 78-2 at 3).  Syversen rightfully exercised this option in April 2019.

**IV.     Conclusion**

For the reasons stated above, the Court finds that the Company Defendants' Motion for Summary Judgment (ECF No. 77) should be and hereby is **GRANTED.**  A judgment of even date consistent with this opinion shall issue.

---

[4] Plaintiff argues that the term "MBO" is ambiguous.  (ECF No. 80 at 10).

**IT IS SO ORDERED** this 14th day of April 2022.

/s/ *Robert T. Dawson*
**ROBERT T. DAWSON**
**SENIOR U.S. DISTRICT JUDGE**